### BURRILL et al. v. CROSSMAN et al.

(District Court, S. D. New York. July 2, 1903.)

1. SHIPPING—DEMURRAGE—DEFENSE OF VIS MAJOR.

The answer of a charterer pleaded the defense of vis major to a libel to recover demurrage for the detention of the vessel for discharging in the port of Rio Janeiro, alleging the existence of a state of war in that city, and that the firing between certain vessels of war in the harbor

---

¶ 1. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

and forts on the shore made it impossible to discharge or receive the cargo any sooner than it was discharged or received. *Held*, that such defense was not sustained by evidence which failed to establish that there was any firing in the vicinity where the vessel lay for discharging which directly prevented such discharge, at least until after the time when, under the charter party, the discharge should have been completed, and where it was shown without contradiction that during such time some portion of the cargo was discharged nearly every day.

In Admiralty. Action against charterers to recover demurrage.

Black & Kneeland, for libellants.
Wheeler, Cortis & Haight, for respondents.

ADAMS, District Judge. This is an action which was brought by the libellants, the owners of the bark Kate Burrill, to recover 53 days' demurrage at the rate of $59.46 per day amounting to $3,151.38, under a charter party dated March 7, 1893, from the respondents as charterers of that vessel. The provisions of the charter party with respect to demurrage, were:

"Cargo to be furnished at port of loading at the average rate of not less than (20M) twenty thousand superficial feet per running day, Sundays excepted, and to be discharged at port of destination at the average rate of not less than (20M) twenty thousand superficial feet per running day, Sundays excepted.

Lay days to commence from the time the vessel is ready to receive or discharge cargo, and written notice thereof is given to the party of the second part, or agent; and for each and every day's detention by default of the said party of the second part, or agent, ($59.46) fifty-nine 46/100 dollars U. S. gold, (or its equivalent), per day, day by day, shall be paid by the said party of the second part, or agent, to the said party of the first part, or agent.

The cargo to be received at the port of loading, within reach of ship's tackles, and to be delivered at port of discharge, according to the custom of said port.

Vessel to discharge at safe anchorage around in Rio bay designated by charterers."

The delay occurred between September 4th and November 28th, 1893, in discharging the vessel, at Rio de Janeiro, and the defence to be considered is that it was owing to vis major, arising from a state of war which prevailed in Brazil at the time and directly prevented the discharge in conformity with the contract.

A history of the case will be found stated in Burrill v. Crossman (D. C.) 111 Fed. 192, decided October 21, 1901, on a question of an amendment to the answer. Since that time, some further testimony has been taken and it remains to be determined whether the defence has been established.

The allegations in the answer, which it is incumbent upon the respondents to sustain, are:

"Fifteenth. And further answering respondents allege upon information and belief that when said vessel arrived at Rio Janeiro, the owners of said cargo used all reasonable diligence in and about receiving the cargo shipped upon the said vessel and removing the same therefrom. That libelants were prevented from discharging the same, and respondents were prevented from receiving the same any sooner than they did, by reason of the act of the public enemy, to wit, certain vessels of war which were then in the harbor of Rio Janeiro, and were engaged in firing upon the forts in said harbor and making war upon the Government of Brazil, and that the firing between said

vessels of war and the said forts made it impossible to discharge the said cargo or to receive it from the said vessel, any sooner than it was discharged or received. That the said cargo was delivered according to the custom of said port of Rio Janeiro, and that the detention alleged in the libel, if any such there be, was caused by said acts of the public enemy and not by any default of respondents. That the captain of the said vessel and Messrs. Phipps Brothers & Co., the agents of the libelants, acquiesced in said delay and recognized the necessity therefor."

It is not urged by the respondents that there was any acquiescence on the part of the master of the vessel or the libelants' agents in Rio in the delay or recognition of the necessity therefor, and any consideration of such questions may be dispensed with. The contention of the respondents, as stated in their brief, is as follows:

"The case made for the respondents is that owing to the revolution which was going on in Brazil at the time, and of the constant firing which was taking place in the harbor, it was impossible for the vendees of the cargo to get men to work, or to do anything more than they did in the matter of discharging cargo. The place where the ship lay was in the part of Rio Janeiro called Gamboa, and in the immediate vicinity of the flour mills. It is proven distinctly that the revolutionists occupied the harbor with their iron-clads, and got possession of some of the forts in the harbor, including Fort Villegaignon; that the Brazilian Government, in order to protect the city, fortified the heights to the west of it, and made barricades along the shore at the foot of the various streets leading to the water, that the insurgent launches and steam vessels were engaged in firing from time to time at these barricades, and that the Brazilian Government was replying, not merely from behind the barricades with smaller artillery, but from the forts upon the hills, that frequently they impressed workmen on the piers into the military service, and that for this reason it was almost impossible to get men to work. In short there can be no question, and it is proven and not denied, that the whole city was in a state of war. It cannot be denied that this directly or indirectly prevented the consignees from doing more than they did to take away the cargo."

The testimony shows beyond a doubt that a state of demoralization prevailed in Rio during the time of the detention owing to a revolution having been attempted there, by certain insurgents who obtained control of several of the Brazilian Government's war vessels and turned their guns upon different points in the harbor, but the indirect effect of such a state of affairs is not available to the respondents.

It was said by Mr. Justice Gray, writing for the Supreme Court in this case (179 U. S. 111, 113, 114, 21 Sup. Ct. 41, 42, 45 L. Ed. 106):

"It is to be remembered that by the terms of this charter-party it is only for 'detention by default of' the charterers or their agent, that they agree to pay the amount of demurrage specified in the charter.

A detention which is caused, not by any act of the ship owners or of the charterers, but wholly by the actual firing of guns from an enemy's ships of war upon the forts in the harbor, directly affecting the vessel and making the discharge of the cargo dangerous and impossible, cannot be considered as caused by 'default' of the charterers, in any just sense of the word.

* * * * * * * * * * * *

In the case at bar, the defence of vis major, as pleaded in the answer, was that the ship owners were prevented from discharging the cargo, and the charterers were prevented from receiving it, any sooner than they did, by reason of acts of the public enemy, to wit, certain vessels of war, then in the harbor of Rio Janeiro, were engaged in firing upon the forts in the harbor and in making war upon the Government of Brazil; that the firing between those vessels and those forts made it impossible to discharge or to re-

ceive the cargo from the vessel any sooner than it was discharged or received; and that the detention alleged in the libel was caused by those acts of the public enemy, and not by any default of the charterers.

The vis major, so pleaded, was, in the words of opinions above cited, a 'superior force, acting directly upon the discharge of the cargo;' 'a direct and immediate vis major;' and 'unusual and extraordinary interruption that could not have been anticipated when the contract was made;' 'a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers,' and an 'interference on the part of an armed force, preventing the handling or moving of the cargo.' "

The inquiry is, therefore, confined to the result of the firing in the vicinity of this vessel, which directly affected the discharge of her cargo.

The libellants' evidence in this connection consists of the testimony of the master of the Burrill, who testified that the revolution broke out after his arrival but that there was no firing or acts of hostility which prevented the discharge of the cargo or its receipt by the consignees, that the wharf where the vessel lay was several miles from the scene of hostilities and was protected by foreign shipping and men of war which lay outside. He also proved the log book of the vessel which shows discharges of cargo: September 6th, 9th, 11th, 12th, 13th, 15th, 16th, 18th, 19th, 20th, 21st, 22nd, 23rd, 25th, 26th, 27th, 28th, 29th, 30th, October 16th, 17th, 23rd, 25th, 27th, November 6th, 16th, 17th, 20th, 24th and 28th.

On the other hand, the respondents have produced witnesses who testified to a state of war in Rio and say this particular locality was affected by the hostilities but the testimony is very general in its character, uncertain as to its dates and does not seem to establish any firing in the vicinity in question which directly prevented the discharge of the cargo. And this is especially true of the time during which the vessel should have been discharged, which, in the absence of vis major, expired on the 6th of October. Fort Villegaignon, for example, especially referred to in the respondents' brief, and the fort most likely from its position to have affected Gamboa, was neutral until the 9th of October, when it went over to the insurgents and afterwards participated in the firing against the city.

It is not disputed that discharging went on during September. On Wednesday, September 6th, some discharging took place although it was cloudy and rainy. The 7th was cloudy and rainy and no discharging took place. The 8th was suitable for discharging but nothing was done. The 9th a small quantity was discharged. The 10th being Sunday, nothing was done. The 11th, 12th and 13th were partly employed in discharging. Up to the 13th, the vessel lay away from the wharf and lighters were employed. There was no log book record of the 14th, but it would seem from the master's testimony, that the discharging was continued that day. After this date, some discharging took place every day, excepting Sundays, up to the 30th, when the discharging was suspended until October 16th, after which it proceeded irregularly until the cargo was finally discharged. All this time, however, it appears that the ship had a full crew and was every day in readiness to perform its part of the discharging. It also appears that the regular work of the ship went on every day with-

out interruption from the hostilities and that at least one other vessel was at the wharf when the Burrill reached it and was being discharged. It may be that after the time expired in which the vessel should have been discharged, the particular locality was so affected at times by the insurrection, that the discharge of the cargo was prevented by a superior force, but before that time the respondents apparently had a full opportunity to fulfill the requirements of their contract free from vis major, as defined by the Supreme Court, and what occurred after their default, arose from their neglect and does not constitute any defence. Lindsay v. Cusimano (C. C.) 12 Fed. 503, 504.

The evidence does not show a detention caused "wholly by the actual firing of guns from an enemy's ships of war upon the forts in the harbor, directly affecting the vessel and making the discharge of the cargo dangerous and impossible" and I conclude that the libellants should recover.

A question of the allowance of interest has been raised in the event of a decision in favor of the libellants, and it is urged that as the Circuit Court of Appeals disallowed interest—91 Fed. 543, 545, 33 C. C. A. 663—this court should also do so. The situation, however, is quite different from that which the case was in when presented on appeal. It was then decided upon exceptions and it was assumed that the merits were with the respondents though the law was against them and that they should not be made to suffer unduly. But now, it is found that the merits are with the libellants and, if such decision is correct, the libellants should not be deprived of the ordinary legal compensation for being kept out of the money which was due them.

Decree for the libellants with interest from November 28, 1893.